**UNITED NUCLEAR CORPORATION**

v.

**Joseph E. CANNON, Director Department of Health of the State of Rhode Island.**

Civ. A. No. 81–0521–S.

United States District Court, D. Rhode Island.

Dec. 13, 1982.

**1224**

Deming Sherman, Patricia Zesk, Providence, R.I., for plaintiff.

Donald Elbert, Jr., Sp. Asst. Atty. Gen., Providence, R.I., for defendant Joseph E. Cannon.

Mary Ellen McCabe, Providence, R.I., for defendant Dept. of Health.

## OPINION AND ORDER

SELYA, District Judge.

This is an action brought by United Nuclear Corporation ("UNC") seeking, *inter alia,* declaratory and injunctive relief. At issue in this action is the constitutionality of S. 924, P.L. 1981, Ch. 85, enacted into law by the Rhode Island General Assembly on May 20, 1981 (hereinafter "S. 924"), which provides in its totality:

> SECTION 1. The United Nuclear Corporation shall be required to post with the Director of Health of the State of Rhode Island a Ten Million Dollar ($10 million) bond for the duration of twenty (20) years to cover any costs expended by the State of Rhode Island to decontaminate those areas surrounding the United Nuclear Corporation facilities within this state, which contamination was caused by the processes of said company.

> SECTION 2. This act shall take effect upon passage.

The ostensible purpose of S. 924 is to ensure proper decontamination of plaintiff's facility located at Wood River Junction, Charlestown, Rhode Island. Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1332.

■ The plaintiff alleges that S. 924 is unconstitutional because (i) it constitutes a bill of attainder; (ii) it is an impermissible *ex post facto* legislation; (iii) it is preempted by the Atomic Energy Act of 1954, as amended, 42 U.S.C. § 2011 *et seq.* (1976) (hereinafter the "Act"); and (iv) it is unconstitutionally vague, thus denying due process rights to UNC. The plaintiff, contending that there is no material issue of fact in dispute, filed this motion for summary judgment [1] together with supporting brief and affidavits.

---

1. The complaint is drawn in a novel manner. In seeking a declaration of S. 924's unconstitutionality, the plaintiff sets forth a number of grounds in support of its contentions. Each of these reasons, if the Court accepts plaintiff's interpretations as applied to the case at bar, would justify UNC's claim of unconstitutionality. Instead of alleging that S. 924 is unconstitutional and proffering arguments in support of the generic contention, the plaintiff denominates each rationale as a separate count each of which, if endorsed by the Court, enables UNC to prevail on its claim of unconstitutionality. In addition to the grounds discussed in the body of the opinion, plaintiff also alleges, as separate counts, that its rights to procedural due process and equal protection of the laws have been abridged by S. 924. UNC, in its motion for summary judgment and in its briefing thereof, does not rely on this count. The counts may be summarized as follows (i) Count I alleges that S. 924 is unconstitutional because it violates the Supremacy Clause of the Constitution; (ii) Count II maintains that S. 924 is a bill of attainder; (iii) Count III avers that S. 924 is an *ex post facto* law; (iv) Counts IV and VI allege abridgement of plaintiff's rights to procedural due process and equal protection of the laws; and (v) Count V contends that S. 924 is so vague that it denies plaintiff's right to substantive due process. In addition to declaratory and injunctive relief, the plaintiff seeks damages pursuant to 42 U.S.C. § 1983. UNC, in its brief, concedes that the determination of the § 1983 claim would require the Court to make a finding as to which a genuine issue of fact exists. This prevents the Court from granting summary judgment on the § 1983 claim. Therefore, the plaintiff's motion is in reality one for partial summary judgment. Also, the plaintiff in this action originally sued the Town of Charlestown, as well as the State, to prevent the Town from enforcing its zoning ordinance. These parties settled their differences, and a

The defendant, also asserting that there are no genuine issues of fact, filed a cross-motion for summary judgment together with a brief and supporting affidavits. In its motion, the State alleges that S. 924 is a constitutionally permissible exercise of its police power.

Oral arguments were heard on these motions on November 12, 1982. After due consideration of the pleadings, briefs, affidavits, and oral arguments, the Court finds that there are no material facts in dispute.

## FACTS

In March of 1964, UNC was licensed by the Atomic Energy Commission [2] to process nuclear fuel and recover enriched uranium ("U–235") from spent nuclear fuel at its Wood River Junction facility. Affidavit of Robert Gregg ¶ 4 (hereinafter "Gregg Affidavit"). The License permitted and permits UNC to handle source material [3] and special nuclear material [4] in quantities sufficient to form critical mass, i.e., quantities in excess of 350 grams of U–235. Id. at ¶ 5. The plant has in the past utilized, and continues to handle, U–235 in quantities sufficient to form critical mass. Id.

During the period of the facility's active operation, Rhode Island entered into an agreement (hereinafter, "the Agreement") with the NRC (effective January 1, 1980) transferring some of its regulatory authority anent radiation hazards to the State. 45 Fed.Reg. 104 (1980). Pursuant to 42 U.S.C. § 2021(b), § 274(b) of the Act, the Agreement permitted the State to regulate only radiation hazards emanating from source material and special nuclear materials in quantities below the level(s) sufficient to form critical mass. Both parties concur that the Agreement did not and does not affect NRC's regulation or licensing of current ongoing operations at the Wood River Junction facility.

Prior to the time that UNC decided to terminate operations at the facility, the NRC, as part of an amendment to the License, required UNC to post a financial commitment with the NRC to insure the availability of sufficient financial wherewithal on the part of UNC fully to carry out decontamination and other procedures and activities appertaining to License termination. Gregg Affidavit ¶¶ 7–8 and Exhibits A & B attached thereto. In August of 1980, UNC elected to cease fuel processing at the facility. Id. at ¶ 6. Work then began on decontamination of the facility subject to any further modifications of the License required by the NRC.

In 1981, during the decontamination process, the License was amended on two occasions. The first amendment stipulated that UNC would remain subject to the provisions of the License until NRC unilaterally released UNC from the obligations thereof. Id. at ¶ 10 and Exhibit C attached thereto. This has not to this date occurred. The second amendment engrafted upon the corpus of the License detailed procedures for decontamination of the facility. Id. at ¶ 11.

Shortly after efforts aimed at decontamination began, UNC experienced difficulty in implementing its plan to dispose of radioactive wastes at a disposal site in Nevada. Exhibit G of Gregg Affidavit. Subsequent

---

stipulation of dismissal was entered in this Court on September 16, 1982 as to that aspect of the litigation. As the defendant is sued only in his official capacity, he is frequently referred to herein as "the State".

2. Prior to January of 1975, the Atomic Energy Commission was vested with the authority to regulate commercial nuclear facilities. In an administrative reorganization, the functions of the Atomic Energy Commission were thereafter allocated to various governmental agencies. Regulation of the commercial nuclear industry was transferred to the Nuclear Regulatory Commission. See 42 U.S.C. § 5841 (1976).

This opinion will refer to the regulatory body as "the NRC," without differentiation between predecessor and successor organizations. This opinion will likewise refer to the NRC's licensing indenture with UNC, as the same has from time to time been amended, as "the License".

3. "Source material" is uranium or other material determined to be source material by the NRC. 42 U.S.C. § 2014(z) (1976).

4. "Special Nuclear material" is defined as isotope 235 of enriched uranium. 42 U.S.C. § 2014(aa) (1976).

to this incident the Governor of the State of Rhode Island, the Honorable J. Joseph Garrahy, banned shipments of wastes originating with UNC from access to state roads. Exhibits F & G, attached to Gregg Affidavit. With citizen concern apparently mounting over the potentialities of the situation, Governor Garrahy wrote on May 7, 1981 to the NRC requesting its assistance in finding solutions to the problems inherent in decontamination and radioactive waste disposal. Exhibit F, attached to Gregg Affidavit. When this letter failed to elicit an immediate response[5], the Rhode Island General Assembly filled what it apparently perceived to be a governmental void by enactment of S. 924. Governor Garrahy signed the bill into law on May 12, 1981.

Passage of the bonding requirement did not, however, mark the end of the saga, but was, in a very real sense, merely the beginning of a new phase of difficulties. The Attorney General's Office of the State of Rhode Island, on June 19, 1981, wrote to Governor Garrahy expressing reservations as to the validity of S. 924. Exhibit B, attached to Plaintiff's Statement of Material Facts. Further concern over the constitutionality and enforceability of S. 924 was manifested in Governor Garrahy's request for an advisory opinion from the Rhode Island Supreme Court anent the legality of S. 924. *Id.* at Exhibit C. The Rhode Island Supreme Court declined to render such an advisory ruling, stating in substance that it could not and would not give an opinion without development of an adversarial record. Exhibit D, attached to Plaintiff's Statement of Material Facts. Shortly thereafter, the Attorney General announced that he would seek immediate enforcement of S. 924. Plaintiff's Statement of Material Facts, Fact # 8. This litigation ensued.

## SUMMARY JUDGMENT STANDARD

▮ A court will not grant summary judgment unless there is no genuine issue as to any material fact, and it clearly appears that the moving party is entitled to judgment as a matter of law. *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). Cross-motions for summary judgment will not, in themselves, warrant the Court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not in dispute. *Redman v. Warrener,* 516 F.2d 766, 768 (1st Cir.1975); *Bricklayers International Union of America, Local 15 v. Stuart Plastering Co.,* 512 F.2d 1017, 1023 (5th Cir.1975); *Hosemann v. Technical Materials, Inc.,* 554 F.Supp. 659, 663 (D.R.I.1982). Cross-motions may be probative of the non-existence of a factual dispute when, as in the case at bar, they demonstrate a basic agreement concerning the relevant legal theories and the dispositive facts. *Bricklayers International,* 512 F.2d at 1023. As noted above, the facts are not in dispute and the record indicates that the only genuine issue is the constitutionality of S. 924. Thus, the case is ripe for summary disposition. *Thyssen Plastik Anger KG v. Induplas, Inc.,* 576 F.2d 400, 402 (1st Cir.1978); and when both parties cross-move on the same legal theory, a court's granting of one party's motion must perforce entail the denial of the adversary's motions. *Schlytter v. Baker,* 580 F.2d 848, 849 (5th Cir.1978); *Stewart v. Dollar Savings and Loan Association,* 523 F.Supp. 218, 220 (S.D. Ohio 1981).

## BILLS OF ATTAINDER

The Court first will determine the statute's constitutionality as to the claim that it is a bill of attainder.

▮ Article I, § 10 of the Constitution prohibits any state from enacting a bill of attainder. A bill of attainder[6] is a legisla-

---

**5.** Joseph Hendrie of the NRC did respond in a letter dated June 12, 1981 advising the Governor that the license amendments should alleviate any concerns which the State of Rhode Island might have over the long-term risks inherent in the delicensing of the facility.

**6.** Bills of attainder originally referred to legislative decrees of the death penalty. *United States v. Brown,* 381 U.S. 437, 441, 85 S.Ct. 1707, 1711, 14 L.Ed.2d 484 (1965). The bill of attainder as referred to in the Constitution also includes bills of pains and penalties which were

tive act which inflicts punishment on a specifically designated person or group without benefit of trial. *United States v. Brown,* 381 U.S. 437, 447, 85 S.Ct. 1707, 1714, 14 L.Ed.2d 484 (1965); *Cummings v. Missouri,* 71 U.S. (4 Wall.) 277, 323, 18 L.Ed. 356. In *Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), the Supreme Court enounced a two-part test for determining whether a legislative enactment is a bill of attainder. If the act impermissibly designates an individual or an easily identifiable group and then proceeds to punish that person or group, the act is a bill of attainder. *Id.* at 472, 97 S.Ct. at 2805.

The plaintiff interprets S. 924 as fulfilling both criteria of the test set forth in *Nixon, supra.* UNC contends that it was singled out, thus meeting the first requirement of the *Nixon* test; and that posting a seven-figure bond for two decades must be viewed as a punishment within the purview of the second prong of the test.

 UNC grossly misreads the Supreme Court's holding in *Nixon.* Although specific designation is a key element of a bill of attainder, the earmarking of a person (whether natural or corporate) or group does not automatically offend the prohibition against bills of attainder. *Id.* The Supreme Court noted that such singling out may be rational in certain circumstances, among these being situations in which an appropriate class of one exists. *Id.* The instant case is illustrative of that paradigm. UNC is the only nuclear fuel processing plant in the state. Thus, the General Assembly's specificity in naming the plaintiff alone, while perhaps not representing an ideal choice of statutory language, may be read to designate a legitimate class of one, and does not *per se* constitute an impermissible singling out. To hold otherwise would impliedly elevate the gossamer of form over the grist of substance.

 Even if the plaintiff could have convinced this Court that the first prong of the *Nixon* test is satisfied, it would still have to show that the posting of a bond is penal within the prohibition against bills of attainder. The Supreme Court, in *Nixon,* 433 U.S. at 472, 97 S.Ct. at 2805, held that the mere imposition of a burden is not punishment for purposes of the bar against bills of attainder. To distinguish between legitimate burdens and illegitimate punishments, this Court must determine whether the alleged punishment, given its terms and severity, furthers a non-punitive legislative end. *Id.* at 475–76, 97 S.Ct. at 2806–07. In making this determination, a court should consider the following factors: (i) whether the legislation safeguards the public interest; (ii) the motivation of the legislature in enacting the statute; and (iii) if there is an apparent unambiguous infliction of punishment, whether a less burdensome alternative exists. *Id.* at 477–83, 97 S.Ct. at 2807–10.

In requiring UNC to post a bond to ensure adequate decontamination efforts and results, the State was not only protecting some generalized concept of the public interest, *cf. Nixon,* 433 U.S. at 472, 97 S.Ct. at 2805, but was attempting to protect the public health and safety against the fearsome dangers of radiation. S. 924 represents, in the Court's view, for purposes of the *Nixon* criteria, a permissible legislative initiative aimed at safeguarding a distinct and substantial public interest.

 Moreover, despite the assertions of UNC, there is nothing in the record that shows even the slightest punitive intent on the part of the General Assembly. This Court is satisfied that the legislature, reacting to public sentiment, was, in enacting S. 924, endeavoring to protect the citizenry from possible hazards concomitant with the perceived imminent delicensing of the plant by the NRC. Admittedly, the legislature's haste may have led to a more onerous burden than might a slower, more thoughtful, more dispassionate analysis of the situation.

legislative exactions of property as punishment for a designated person or group. *Id.* at 447, 85 S.Ct. at 1714; *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 138, 3 L.Ed. 162 (1810). Any reference to bills of attainder herein encompasses bills of pains and penalties.

Be that as it may, neither the proposed face amount of the putative bond nor the duration thereof shocks the conscience of this Court, given the obvious perils of radioactivity at the critical mass levels in question and given current scientific uncertainty as to the longevity of the adverse effects of radiation. In any event, precise analysis as to the existence, on these facts, of a less burdensome alternative need not be undertaken by the Court because it has not found that the General Assembly acted with punitive intent in passing S. 924. *See id.* at 483–84, 97 S.Ct. at 2811.

The Court holds, therefore, as a matter of law, that S. 924 is not outlawed as a bill of attainder.

### EX POST FACTO LEGISLATION

■ Count III of plaintiff's complaint alleges that S. 924 is an *ex post facto* law. An *ex post facto* law was originally conceived to be any law which renders an action done before the passing of the law and which was innocent when done, criminal; and which exacts punishment upon such action. *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798). This definition has been altered slightly over time, and now connotes a law which imposes a punishment for an act which was not punishable at the time it was committed. *Cummings v. Missouri,* 71 U.S. (4 Wall.) 277, 325–26, 18 L.Ed. 356 (1867); *accord Weaver v. Graham,* 450 U.S. 24, 28, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981).

The plaintiff argues that S. 924 imposes a sanction on UNC for actions which UNC undertook prior to the enactment of S. 924, and which were not punishable prior to the enactment of the statute. Therefore, plaintiff contends that it is confronted with an *ex post facto* law. In opposition, the State argues that the posting of a bond is neither a criminal penalty nor a criminal penalty masquerading as a civil penalty.

■ The Supreme Court has consistently held that the *ex post facto* prohibition relates exclusively to criminal statutes or civil statutes which camouflage criminal penalties. *Galvan v. Press,* 347 U.S. 522,

531 & n. 4, 74 S.Ct. 737, 742 & n. 4, 98 L.Ed. 911 (1954); *Bankers Trust Co. v. Blodgett,* 260 U.S. 647, 652, 43 S.Ct. 233, 235, 67 L.Ed. 439 (1923); *see United States Trust Co. v. New Jersey,* 431 U.S. 1, 17 n. 13, 97 S.Ct. 1505, 1515 n. 13, 52 L.Ed.2d 92 (1977). Thus, every after-the-fact imposition of a burden will not implicate the *ex post facto* prohibition in the United States Constitution. *Weaver v. Graham, supra,* enunciated the modern standard for determining whether a legislative enactment is an *ex post facto* law. If the statute is retrospective and if it impermissibly disadvantages the offender affected by it, the statute is an *ex post facto* law. *Id.* 450 U.S. at 29, 101 S.Ct. at 964. After considering the arguments of both parties and the relevant authorities, the Court is constrained to conclude that UNC cannot meet the test set out in *Weaver v. Graham, supra.*

The plaintiff has failed to convince the Court that S. 924 is retrospective in nature. In *Chicago & Alton Railroad v. Tranbarger,* 238 U.S. 67, 35 S.Ct. 678, 59 L.Ed. 204 (1915), the Supreme Court had to decide whether a legislative enactment was retrospective for purposes of the prohibition against *ex post facto* laws. The legislation in question penalized any railroad for maintaining an embankment which failed to comply with the statute. The appellant contended that the statute could not lawfully apply to embankments constructed before passage of the act. The Court held that the law was not retrospective because it penalized the Railroad for continued maintenance of a dangerous condition, *id.* at 73, 35 S.Ct. at 680, and not for erecting the embankment. *Id.* The Supreme Court was faced with an analogous situation in *De Veau v. Braisted,* 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960). There, an officer of the International Longshoremen's Union challenged a statute which would have forced him to relinquish union office because he had pleaded guilty to the commission of a felony prior to the enactment of the statute. The Court held that the legislation was not retrospective, since the statute did not punish the officer for past

infractions of the law. *Id.* at 160, 80 S.Ct. at 1155. Instead, the Court held that the legislation was a valid attempt currently and prospectively to regulate and reduce ongoing criminal activity at the waterfront. *Id.*

The holdings of *Chicago & Alton Railroad* and *De Veau* are applicable to the instant facts, and are persuasive as to the outcome. Although UNC may feel burdened by the impact of S. 924, the statute does not punish the plaintiff for actions taken prior to its enactment. On the contrary, the facial purpose of S. 924 is to ensure that UNC does not abandon the Wood River Junction facility without ameliorating the potential hazards emanating from radioactive waste at the plant; it only regulates the continued maintenance and hoped-for correction of a current condition, and is not retrospective for purposes of the prohibition against *ex post facto* laws.

Even if S. 924 met the retrospectivity prong of the *Weaver v. Graham* standard, the plaintiff still would fail to carry its burden of establishing that S. 924 was an *ex post facto* law, because the plaintiff has not shown itself to have been wrongly disadvantaged by the statute. As mentioned above, *Weaver v. Graham, supra,* teaches that an *ex post facto* prohibition applies only to criminal penalties and, in the rare case, criminal penalties in civil costumery. Although the plaintiff nakedly asserts the applicability of the *Weaver* definition to S. 924, UNC fails to cite,[7] and the Court has been unable to find, any holding elsewhere to the effect that the posting of a bond is a punishment within the ambit of the *ex post*

*facto* prohibition.[8] Thus, S. 924 cannot be said, as a matter of law, to run afoul of the mandate; nor to violate the prohibition against the enactment of such laws.

## PREEMPTION

The Court next turns to the issue of the State's authority under the Constitution to impose regulations on UNC's facility. Article VI, clause 2, of the Constitution (the so-called Supremacy Clause) provides:

> This Constitution, and the laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; · and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding

This clause, in essence, elevates federal law above state law, and is the basis of that portion of plaintiff's motion which argues in essence that S. 924 is preempted by the Act and the regulations promulgated thereunder. The State contends, in its cross-motion, that S. 924 does not conflict with the Act and is, thus, not subject to preemption under the Supremacy Clause.

The underlying principle of preemption is that state law is invalid when it conflicts with a federal statutory or regulatory framework. *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). While the principle itself is an

7. The cases cited by the plaintiff on this point are inapposite. Although these cases do hold that a deprivation of a property right may be punishment for purposes of the *ex post facto* clause, *see, e.g., Ex Parte Garland,* 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1866), they deal with the state's deprivation of an individual's capacity to earn a living. *Compare De Veau v. Braisted,* 363 U.S. at 160, 80 S.Ct. at 1154. The posting of a bond does not deprive UNC of its corporate right to operate its business.

8. One can imagine circumstances in which the amount of a bond is so grossly exaggerated,

given the justification for the requirement, that it becomes simply a convenient ruse for putting a person, firm, or corporation out of business. *See Marks v. City of Newport,* 344 F.Supp. 675, 678 (E.D.Ky.1972); *cf. Bayside Enterprises, Inc. v. Carson,* 450 F.Supp. 696, 705 (M.D.Fla.1978) (excessive license fee). There is nothing in the record, however, which would require or support any such intimation here. While the amount of the bond is admittedly large, so are the dimensions of the perceived threat to public health and safety associated with incomplete or inadequate decontamination of UNC's facilities.

abecedarian tenet of our jurisprudence, the application of it to the instant case is a more complex matter.

There is a presumption of constitutional validity when a state exercises its legitimate police powers; and this presumption is particularly strong when a state endeavors to protect the public health and safety. *Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 442, 80 S.Ct. 813, 815, 4 L.Ed.2d 852 (1960). Any state exercise of its police power is invalidated by reason of preemption only when Congress has made manifest its intent that federal law shall be controlling. *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978); *Illinois v. Kerr-McGee Chemical Corp.,* 677 F.2d 571, 578 (7th Cir.1982).

A variety of approaches have been employed to determine when Congress has voiced its intent to preempt state regulation. In the most perspicuous cases, when Congress has expressly declared in the legislation in question that no state regulation is to be permitted, the courts must simply follow the congressional roadmap. *Jones v. Rath Packing Co.,* 430 U.S. 519, 530–31, 97 S.Ct. 1305, 1312, 51 L.Ed.2d 604 (1977); *Campbell v. Hussey,* 368 U.S. 297, 302, 82 S.Ct. 327, 329, 7 L.Ed.2d 299 (1961). Secondly, if compliance with both state and federal law is impossible, federal law must control. *Florida Lime & Avocado Growers, Inc.,* 373 U.S. at 142–43, 83 S.Ct. at 1217. If neither of these methods of ascertaining congressional intent applies, the Court must then examine whether (i) the intent to preempt is patently implied by a pervasive statutory and regulatory mosaic, *City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 633, 93 S.Ct. 1854, 1859, 36 L.Ed. 547 (1973), or (ii) such intent can be inferred in that the subject matter of the statute by its very nature requires uniform national regulation. *Florida Lime & Avo-*

cado Growers, Inc., 373 U.S. at 143–44, 83 S.Ct. at 1218; *Northern States Power Co. v. Minnesota,* 447 F.2d 1143, 1146 (8th Cir. 1971), *aff'd mem.,* 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972). Even if the court finds such an expression of intent, it will only invalidate state law to the extent of the preemption, and not beyond the natural boundaries thereof. *Illinois v. Kerr-McGee Chemical Corp.,* 677 F.2d at 679; *see Pacific Legal Foundation v. State Energy Resources Conservation & Development Commission,* 659 F.2d 903, 919 (9th Cir. 1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 2956, 73 L.Ed.2d 1348 (1982) (hereinafter *"Pacific Legal Foundation"*). The *nisi prius* court must, in dealing with this body of law, utilize a scalpel—not a meat-axe.

These principles crystallize the issues and delimit the inquiry of this Court to the following: (i) whether Congress' intent to preempt S. 924 and kindred state laws clearly is manifested in the Act and the regulations promulgated pursuant to it; and (ii) whether Congress has created or left open any interstices in this mosaic which allow the State to enforce S. 924.

The courts are consentient in holding generally that state regulation of radiation hazards is preempted by the Act.[9] *Illinois v. Kerr-McGee Chemical Corp.,* 677 F.2d at 581; *Silkwood v. Kerr-McGee Corp.,* 667 F.2d 908, 922 (10th Cir.1981), *petition for writ of certiorari filed,* 51 U.S.L.W. 3025 (U.S. Aug. 3, 1982) (No. 81–2159); *Pacific Legal Foundation,* 659 F.2d at 923 & n. 32; *Northern States Power Co. v. Minnesota,* 447 F.2d at 1154; *United States v. City of New York,* 463 F.Supp. 604, 612 (S.D.N.Y. 1978); *see Train v. Colorado Public Interest Research Group,* 426 U.S. 1, 15–17, 96 S.Ct. 1938, 1945, 48 L.Ed.2d 434 (1976). This preemption endures except when the state has entered into an agreement pursuant to § 274(b) of the Act, 42 U.S.C. 2021(b), which permits a state to regulate certain

---

**9.** For a detailed history of the federal government's regulation of atomic energy see: *Northern States Power Co. v. Minnesota,* 497 F.2d 1143, 1147–49 (8th Cir.1971), *aff'd mem.,* 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972);

Murphy & Lapierre, Nuclear Moratorium Legislation in the States and the Supremacy Clause: A Case of Express Preemption, 76 Colum.L. Rev. 392 (1976).

radiation hazards, *Illinois v. Kerr-McGee Chemical Corp.,* 677 F.2d at 581; *Northern States Power Co. v. Minnesota,* 447 F.2d at 1148–49; and then, is lifted only in those areas as to which a § 274 agreement can, under the statute, be operative. Thus, Minnesota has been prevented from regulating radiation emissions from a nuclear power plant unless and until it entered into a § 274 agreement granting the state the authority to regulate such emissions. *Northern States Power Co. v. Minnesota,* 447 F.2d at 1154. In so holding, the Eighth Circuit reasoned that the legislative history, and the enactment of § 274(k) of the Act, 42 U.S.C. § 2021(k), precluded dual regulation of radiation hazards. *Id.* at 1148–50; *accord Illinois v. Kerr-McGee Chemical Corp.,* 677 F.2d at 580–81.

▇ Although Rhode Island has entered into a § 274 agreement and can regulate radiation hazards, its authority is limited, by the Act as well as the Agreement, to hazards emanating from radioactive material in quantities not sufficient to form critical mass. 42 U.S.C. § 2021(b); *see* 45 Fed. Reg. 104 (1980). As a necessary corollary, therefore, it follows inexorably that the state remains preempted from regulating fissionable substances not covered by the Agreement, since the federal government has not ceded authority so to regulate. 42 U.S.C. § 2021(b); *see Illinois v. Kerr-McGee Chemical Corp.,* 677 F.2d at 581; *Washington State Building & Construction Trades Council v. Spellman,* 518 F.Supp. 928, 932 (E.D.Wash.1981), *aff'd,* 684 F.2d 627 (9th Cir.1982). In the matter at bar,

the NRC continues to maintain licensing strictures vis-a-vis UNC, as the materials at issue are indeed, as noted above, in quantities sufficient to comprise critical mass. Where, as here, federal suzerainty yet holds sway, the state sovereign may not be permitted to trespass.

Based on these authorities, the State at oral argument virtually conceded its lack of authority to regulate UNC's current decontamination operations because of the preemptive force of the Act as to regulatory jurisdiction over high-level radioactive wastes. However, the State still robustly contends that the cases do not interdict the enforcement of S. 924 upon and after termination of the License. At this yet-uncertain future time, the State argues, UNC will no longer be subject to federal regulation; and the State could then, the Court is told, regulate UNC's facility without raising the red flag of impermissible dual supervision. The State suggests, therefore, that the Court, presumably by the exercise of thaumaturgical feats of judicial legerdemain, interpret S. 924 as taking effect only in that manner, thereby dodging the preemption bullet.[10] The plaintiff contests the State's assertion that *seriatim* regulation is distinguishable from impermissible dual regulation; and further contests the interpretation of the statute belatedly urged by the defendant at oral argument.[11]

Although there is some scant case law interpreting a state's authority pursuant to a § 274 agreement,[12] there is apparently none delineating a state's capacity, pursu-

---

**10.** As yet a further alternative, the State urges that, since the Assistant Attorney General at oral argument expressly declared it to be his Department's current policy not to attempt to enforce S. 924 until the license had run its course and NRC's hegemony over UNC had ended, the Supremacy Clause is no longer at issue. This suggestion is of a piece with the statutory construction argument limned above. Both approaches are subject to identical infirmities and the teachings of this opinion as to the entire issue of *seriatim* regulation apply with equal force, no matter which approach the defendant uses.

**11.** The defendant nowhere reconciles its present advocacy of future intent and of the

thrust toward *seriatim* regulation with its admission, contained in ¶ 26 of the defendant's answer to the plaintiff's complaint, to the effect that the State had already taken steps toward the enforcement of S. 924 before UNC commenced this litigation.

**12.** In *Washington State Bldg. & Constr. Trades Council v. Spellman,* 518 F.Supp. 928 (E.D. Wash.1981), *aff'd,* 684 F.2d 627 (9th Cir.1982), the court addressed the issue of a state's authority concurrently to regulate low-level radioactive wastes pursuant to a § 274 agreement and not whether the state could regulate high level radioactive wastes after the federal government ceased to do so.

**1232**

ant to a § 274 agreement, to impose regulations on a facility to take effect only after the NRC terminates the facility's license. The only case which discusses the issue of a state's authority to regulate radiation hazards absent federal regulation is *Illinois v. Kerr-McGee Chemical Corp., supra.* There, the court was faced with an attempt by the City of West Chicago to abate nuisances created by Kerr-McGee's dumping of radioactive materials at various disposal sites within the municipal boundaries. *Id.* at 578. The Court held that, to the extent the NRC had no authority to require Kerr-McGee to clean-up disposal sites not within the confines of the defendant's own plant, the city would not be preempted from abating such nuisances. *Id.* at 584. If, however, the NRC did have authority to require Kerr-McGee to clean-up such sites, any attempt by the city to force that defendant to do the same would be preempted. *Id.*[13]

 S. 924 unambiguously states that it takes effect upon passage. Unless there is some substantial indication of legislative intent to the contrary, this Court cannot interpret S. 924 in contravention of its plain meaning. *Ford Motor Credit Co. v. Cenance,* 452 U.S. 155, 158 n. 3, 101 S.Ct. 2239, 2241 n. 3, 68 L.Ed.2d 744 (1981); *United States Lines, Inc. v. Baldridge,* 677 F.2d 940, 944 (D.C.Cir.1982); *Matala v. Consolidation Coal Co.,* 647 F.2d 427, 429 (4th Cir. 1981). No such indication appears. Thus, the Court must construe S. 924 as an attempt at *simultaneous,* not *seriatim,* regulation; and is constrained to conclude that S.

924 is preempted, and is therefore invalid under the Supremacy Clause.[14]

## VAGUENESS

The plaintiff alleges, finally, that S. 924 is so vague and imprecise in its terms that UNC is compelled literally to guess at its meaning and requirements. Thus, plaintiff contends that S. 924 violates its due process rights guaranteed by the Constitution. In its cross-motion, the State asseverates that S. 924 must perforce be general and non-specific in order to effectuate its legitimate purposes. Furthermore, the State maintains that the exact requirements of the bond can be ascertained from UNC's past dealings with its own filing of bonds, bonds filed by independent contractors with UNC, and general commercial practices. UNC, the State argues, is able readily to discern the fair meaning of S. 924, and there is no violation of plaintiff's due process rights.

 The Fourteenth Amendment to the Constitution provides that no state "shall deprive any person of life, liberty, or property, without due process of law." It is well settled that a statute which is unduly vague violates the due process clause for two reasons: (i) such a law will not permit a person of ordinary intelligence either to avoid violating its prohibitions or to effectuate due compliance therewith; and (ii) such a law impermissibly delegates legislative policy-making to those charged with enforcing the legislature's intendments. *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222

---

**13.** Illinois had not entered into an agreement with the NRC to take over some of the NRC's regulatory authority. Thus, the Seventh Circuit was interpreting the state's authority to regulate nonradiation hazards pursuant to § 274(k) of the Act. *Illinois v. Kerr-McGee Chem. Corp.,* 677 F.2d at 580.

**14.** In view of the fact that S. 924, as enacted, cannot sensibly be interpreted as a legislative initiative to set in place a *seriatim* regulatory scheme, the Court need not pass upon the question of whether or not, having settled principles of preemption in mind, a properly drafted *seriatim* regulation statute would withstand constitutional challenge. Surface logic suggests, however, no immediately apparent rea-

son why such anticipatory legislation would necessarily fail.

A properly drafted statute imposing *seriatim* regulation would seemingly have to consider, in addition to the timing problem as to effectiveness, *inter alia:* (i) the ambient radiation levels of the area after license termination; (ii) the authority of the NRC to regulate the facility after license termination; (iii) the authority of the NRC vis-a-vis the state in regulating areas adjacent to the plant, but which are not covered by the NRC license; and (iv) whether, pursuant to the § 274 agreement, the State can impose stricter standards of decontamination than those imposed by the NRC declaration of fitness for unrestricted use.

(1972); *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972).

■ An unconstitutionally vague statute is one compelling a person of average intelligence to guess and to resort to conjecture as to its meaning and/or as to its supposedly mandated application. *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926); *Precious Metals Associates, Inc. v. Commodity Futures Trading Commission,* 620 F.2d 900, 906–07 (1st Cir.1980). This rule, originally adopted for criminal statutes, *see Collins v. Kentucky,* 234 U.S. 634, 638, 34 S.Ct. 924, 925, 58 L.Ed. 1510 (1914), has been extended to civil statutes, *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 497, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) (hereinafter *"Village of Hoffman Estates"*); *Broadrick v. Oklahoma,* 413 U.S. 601, 607–08, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1970); *see A.B. Small Co. v. American Sugar Refining Co.,* 267 U.S. 233, 239, 45 S.Ct. 295, 297, 69 L.Ed. 589 (1925); *Exxon Corp. v. Busbee,* 644 F.2d 1030, 1033 (5th Cir.), *cert. denied,* 454 U.S. 932, 102 S.Ct. 430, 70 L.Ed.2d 239 (1981).

■ The stringency with which this definition is applied depends on the circumstances of the case at bar. For example, an economic regulation ordinarily will be scrutinized under a lower-magnification microscope than a criminal statute. *Village of Hoffman Estates,* 102 S.Ct. at 1193. Likewise, a statute imposing civil penalties on the exercise of constitutionally protected rights must be drafted with greater precision than a statute imposing like penalties

on activities not within this infrangible ambit. *Id.* 102 S.Ct. at 1193–94; *Grayned v. City of Rockford,* 408 U.S. at 109, 92 S.Ct. at 2299.

■ With these overriding principles of due process in mind, the Court must ascertain if S. 924 measures up to the constitutional benchmark. In undertaking this responsibility, the Court is mindful that it has a duty to give effect, if possible, to a state statute. *McCown v. Heidler,* 527 F.2d 204, 207 (10th Cir.1975); *Wilshire Oil Co. v. Costello,* 348 F.2d 241, 243 (9th Cir.1965); *see Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975); *United States v. New England Coal & Coke Co.,* 318 F.2d 138, 142 (1st Cir.1963). Notwithstanding the foregoing precept, however, the federal judiciary has no warrant to engage in emergency surgery which necessitates the ligation of the constitutional rights of private parties; the federal courts cannot create a constitutional interpretation of a state statute when the statute is not reasonably susceptible to a salvagable construction. *Florida Businessmen For Free Enterprise v. Florida,* 499 F.Supp. 346, 352 (N.D.Fla.1980), *aff'd,* 673 F.2d 1213 (11th Cir.1982).[15]

S. 924 possesses, at the very least, the rare virtue of brevity. It provides in substance that the plaintiff "shall be required to post ... a Ten Million Dollar ($10 million) bond for the duration of twenty (20) years ... to cover costs of decontamination, ... which contamination was caused by the processes..." of UNC. The State asserts that this statute is no more general than other Rhode Island statutes requiring

---

**15.** It is an axiom of federalism that state courts are the final arbiters of a state statute's meaning, *Garner v. Louisiana,* 368 U.S. 157, 169, 82 S.Ct. 248, 254, 7 L.Ed.2d 207 (1961); *Rundlett v. Oliver,* 607 F.2d 495, 500 (1st Cir.1979), unless the state court's interpretation is an "obvious subterfuge to evade consideration of a federal issue." *Mullaney v. Wilbur,* 421 U.S. 684, 691 n. 11, 95 S.Ct. 1881, 1886 n. 11, 44 L.Ed.2d 508 (1975). Thus, any interpretation by the federal courts of a state statute regarding nonfederal issues may be overturned by the state court. *Cf. Radio Station WOW v. Johnson,* 326 U.S. 120, 129, 65 S.Ct. 1475, 1480, 89 L.Ed.

2092 (1945). To avoid the fruitless use of federal judicial resources, a number of courts have held or intimated that federal courts should not give limiting interpretations to state statutes. *Universal Amusement Co. v. Vance,* 587 F.2d 159, 172 (5th Cir.1978), *aff'd,* 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980); *Horn v. Burns and Roe,* 536 F.2d 251, 254 n. 7 (8th Cir.1976); *see United States v. Thirty Seven Photographs,* 402 U.S. 363, 369, 91 S.Ct. 1400, 1404, 28 L.Ed.2d 822 (1971); *High Ol'Times, Inc. v. Busbee,* 673 F.2d 1225, 1230 (11th Cir. 1982); *Knapp v. Cardwell,* 667 F.2d 1253, 1259 (9th Cir.1982).

the posting of a bond in order to engage in a regulated activity. Any argument raised by the State as to the indefiniteness required of bonding statutes is belied by even a cursory examination of the Rhode Island General Assembly's enactments of detailed bonding statutes in other contexts. In contrast to S. 924, for example, the statutes regulating the use of blasting equipment and the collection of taxes from distributors of gasoline products require sureties. R.I. Gen.Laws §§ 23–28.28–32, 31–36–3 (1979). Unlike S. 924, moreover, both of these statutes require that the state agency regulating the activity approve the sureties. In further contradistinction to S. 924, these statutes explicate when and under what circumstances the bonds are to be forfeited. Finally, these statutes set forth standards to be applied in conducting the regulated activity, be it blasting or collecting taxes. S. 924, to the contrary, is as silent as the grave with respect to any such standards. Neither "contamination" nor "decontamination" are described or defined either explicitly or by extrinsic reference; there is no attempt made to delimit the affected "areas"; there is no express link between the statutory prescription and the presence of radioactivity or of nuclear material.[16] The enumeration could go on, but to no purpose; the point is clear.

Although the Supreme Court has upheld statutes regulating business conduct wherein to some extent imprecision infected the legislatively selected language, e.g., *Village of Hoffman Estates, supra,* none were as vague and constitutionally lame as S. 924. By way of illustration, in *Village of Hoffman Estates,* a merchant of drug paraphernalia challenged the Village's ordinance regulating the sale of items "designed or marketed for use" with illegal cannabis or drugs. The Supreme Court held that the "designed for use" standard in the ordinance was sufficiently clear, given the con-

text of the activity at issue (selling drug paraphernalia such as roach clips, water pipes, and rolling paper), to enable persons of common intelligence to discern the course of conduct prohibited by the ordinance. *Id.* 102 S.Ct. at 1195; *see McGowan v. Maryland,* 366 U.S. 420, 428, 81 S.Ct. 1101, 1106, 6 L.Ed.2d 393 (1961).

A vague statute which regulates business conduct also may in some circumstances be saved if the act implies a requirement of scienter. *Village of Hoffman Estates,* 102 S.Ct. at 1195–96; *Colautti v. Franklin,* 439 U.S. 379, 395, 99 S.Ct. 675, 685, 58 L.Ed.2d 596 (1979); *Boyce Motor Lines v. United States,* 342 U.S. 337, 342, 72 S.Ct. 329, 331, 96 L.Ed. 367 (1952). In *Village of Hoffman Estates,* the Court, as noted above, upheld the ordinances "marketed for use" standard as not being unconstitutionally vague because of the inherent implication of a scienter requirement. *Id.* 102 S.Ct. at 1196. The Court reasoned that a merchant could not market items for a particular use unless the merchant intended the item to be used in that manner. *Id.*

It is, in the Court's view, a quantum leap from *Village of Hoffman Estates* and the municipal ordinance contested there to the Town of Charlestown and S. 924. In the case at bar, the statute not only references the affected processes, the feared contamination, and the future decontamination, all in the most perfunctory of terms, but it also contains a singular dearth of guidance as to the form and characteristics of the legislatively mandated bond, the conditions of its posting, operation, forfeiture, and discharge, and a plethora of related factors. S. 924, unlike the head-shop ordinance in *Village of Hoffman Estates,* has no language which saves it from constitutional infirmity. There is no statutory phraseology even remotely implying a requirement of scienter on the part of UNC. While the ordinance in *Village of Hoffman Estates*

16. The failure of the statute to forge this link in and of itself leads to constitutional problems. To the extent that the "processes" of UNC are not unique within the State, i.e., are not limited to the handling of nuclear material at levels over those required to form critical mass, the

regulatory thrust of S. 924 might well amount to an impermissible singling out of the plaintiff. In view of the tenor and holdings of this opinion as a whole, however, any such questions need not contemporaneously be answered.

was sickly to some extent, it was capable of being nursed back to health by the principles heretofore enunciated, *see McCown v. Heidler,* 527 F.2d at 207; *Wilshire Oil Co. v. Costello,* 348 F.2d at 243; S. 924, on the other hand is not susceptible to any judicial cure. It demands a different prognosis: it is terminally ill, and the malady is without question fatal.

Nor is S. 924, in this regard, subject to salvation by reference to other legislation or to regulations existing or to be promulgated under a proper rule-making delegation.[17]

■ Even if a legislative pronouncement is peccant in that it has no internalized language which can save it from constitutional infirmity, the statute may be palliated if the affected party can rationally be expected to resort to the administrative process for clarification of that party's rights and obligations thereunder. *Village of Hoffman Estates,* 102 S.Ct. at 1193; *Joseph E. Seagram & Sons, Inc. v. Hostetter,* 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966) (hereinafter *"Seagram's"*). In *Seagram's,* a number of distillers contested a statute requiring that the brand owner, its agent or any "related person" file an affirmation of compliance with pricing provisions of New York's Alcoholic Beverage Control law. The distillers alleged that both the phrase "related person" and its statutory definition were unconstitutionally vague *Seagram's* at 48, 86 S.Ct. at 1262. The Supreme Court rebuffed the challenge because the standard was not so vague as to pretermit the promulgation of regulations by the State Liquor Authority further defining "related person." *Id.* at 49, 86

S.Ct. at 1263. Similarly, the ordinance at issue in *Village of Hoffman Estates* contained enabling language which expressly delegated enactment of further regulations to the police and health departments. *Id.* 102 S.Ct. at 1193.

■ S. 924, in contradistinction to the above-described legislative initiatives, contains no language delegating any authority to any agency of the state government for the promulgation of regulations governing the posting or forfeiture of the bond. Notwithstanding this deficiency, the defendant hortatively asserts that its General Treasurer and Department of Health, acting severally or jointly, can supply any and all ingredients which the statutory formulation itself lacks. In support of these arguments, the State has proffered, *inter alia,* affidavits of General Treasurer Anthony J. Solomon and of Dr. Joseph E. Cannon, Director of the Department of Health, as to their respective interpretations of S. 924, and as to the practices and procedures which each would employ to implement its provisions.[18] While the Court appreciates the willingness of both Mr. Solomon and Dr. Cannon, each an exemplary public servant, to play Cerimon to the statute's Thalsa, S. 924 cannot be so resuscitated. Where, as here, the legislative enactment itself fails to delineate or to suggest any standards, and contemporaneously fails properly to delegate rulemaking powers sufficient to create the omitted standards, the statutory patient cannot be saved. *Village of Hoffman Estates,* 102 S.Ct. at 1193; *S & H Riggers & Erectors, Inc. v. Occupational Safety & Health Review Commission,* 659 F.2d 1273, 1282 (5th Cir.1981); *Diebold, Inc. v. Marshall,* 585 F.2d 1327, 1338 (6th Cir.1978).

17. The State cannot plausibly sustain its argument that the standards for decontaminating the area will be promulgated by the Department of Health's Radiation Control Agency. S. 924 does not delegate rulemaking authority to any state agency; nor can the court read such a requirement into S. 924. *Universal Amusement Co. v. Vance, supra,* note 15, at 172.

18. So long as no actual delegation has been made to these officials by the General Assembly, there would be little to prohibit either official from revising his interpretations at will, at

any time or from time to time. *Cf. Stark v. Wickard,* 321 U.S. 288, 309–10, 64 S.Ct. 559, 570–71, 88 L.Ed. 733 (1944); *Office of Consumers' Counsel v. Federal Energy Regulatory Commission,* 655 F.2d 1132, 1149–50 n. 32 (D.C.Cir.1980); *Real v. Simon,* 510 F.2d 557, 564 (5th Cir.1975). Moreover, the General Treasurer is elected only for a two-year term, R.I. Const. amend. 16, § 1, and the Director of Health is appointed for a fixed term of five years, R.I.Gen.Laws § 42–6–9 (1979). Neither official can, in this context, bind his successor.

■ It is from any rational perspective almost impossible for UNC to discern its rights and responsibilities under S. 924 without engaging in rampant prognostication. This Court must conclude, therefore, that S. 924 is unconstitutionally vague and that it patently denies UNC of its due process rights.

## CONCLUSION

The Court is cognizant of the dire threat which disposal of radioactive wastes may pose to modern American society, and is equally cognizant of the need for both strict rules and rigorous enforcement in order to insure that decontamination is, in the nuclear context, carried out as thoroughly and as safely as is humanly possible. Congress has, in its wisdom, entrusted front-line responsibility in this effort to the NRC. The fifty sovereign states, Rhode Island included, must accede to this determination, and are at liberty to operate only within this framework. To the extent that the federal regulatory mosaic permits state legislatures to take independent regulatory action, that residual power must be exercised exclusively by legislation which is painstakingly crafted to attain legitimate objectives within the delineated scope of allowable state action. While S. 924, for the reasons hereinbefore set forth, falls far short of these criteria, the concerns of Rhode Island's General Assembly are recognized as real; and the Court has attempted to elucidate guidelines herein which, it is hoped, may be of some assistance should the legislature wish to consider anew the problems presented.

For the reasons stated, it is hereby ORDERED:

1. Defendant's cross-motion for summary judgment is granted as to Counts II and III of the complaint (and the plaintiff's motion as to each of such counts is, accordingly, denied).

2. Plaintiff's motion for partial summary judgment is granted as to all of the remaining counts contained in the complaint (and the defendant's cross-motion as to such counts is, accordingly, denied).

3. The statute (S. 924) is hereby declared to be unconstitutional, both on its face and as applied to the plaintiff.

4. The defendant is hereby permanently restrained and enjoined from enforcement of the statute (S. 924) and/or from acting or threatening to act thereunder, and/or from attempting, directly or indirectly, to secure or to insist upon compliance therewith.

5. As to all issues not subsumed by the granting and denial of the instant motions, as limned herein, the parties shall, within forty-five days from the date of entry hereof, confer; and shall jointly file with the Court a statement as to whether or not such remaining issues have become moot (and if not, the suggestions of the parties as to the conduct of further proceedings herein to the end that this action may be fully concluded).