**UNITED STATES LINES, INC.,**
**Appellant,**

v.

**Malcolm BALDRIDGE, Secretary of Commerce, and Samuel B. Nemirow, Assistant Secretary of Commerce.**

No. 81–1474.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 16, 1982.

Decided May 14, 1982.

Russell T. Weil, with whom James W. Pewett, Washington, D. C., was on the brief, for appellant.

Theodore M. Grossman, Atty., Dept. of Justice, with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed, and Anthony J. Steinmeyer, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellees.

Before ROBINSON, Chief Judge, WRIGHT, Circuit Judge, and NOR-THROP,\* Senior District Judge.

Opinion for the court filed by Senior District Judge NORTHROP.

NORTHROP, Senior District Judge:

In this appeal the appellant, United States Lines, Inc. (hereinafter "U. S. Lines"), challenges the application of Section 506 of the Merchant Marine Act, 1936, 46 U.S.C. § 1156 (1976), to military time charters of vessels built with construction-differential subsidies (hereinafter "CDS"), pursuant to Section 501 of the Act, 46 U.S.C. § 1151 (1976).

Appellees, Malcolm Baldridge, Secretary of Commerce, and Samuel B. Nemirow, Assistant Secretary of Commerce for Maritime Affairs, contend that the plain meaning of Section 506 of the Act and its legislative history require repayment of a portion of the CDS by any and all vessels whose operations fall within those areas of domestic trade designated by Section 506. Appellees contend that there is no exception to this requirement with regard to operations of CDS-built vessels in domestic trade while under military time charters.

## I. BACKGROUND

During the period 1960 through 1962, U. S. Lines had entered into three construction-differential subsidy contracts with the United States for construction of fourteen vessels. (Joint Appendix (JA) 474–499.) Section 501 of the Merchant Marine Act, 1936 sets out certain requirements with regard to application for construction subsidies for vessels to be operated in foreign commerce. The statute requires approval of the application for the subsidy by the Secretary of Commerce and submission of the plans and specifications for the pro-

---

\* Of the United States District Court for the District of Maryland, sitting by designation pursuant to 28 U.S.C. § 294(d) (1976).

posed vessel to the Department of the Navy for a determination that the vessel is "suitable for economical and speedy conversion into a naval or military auxiliary, or otherwise suitable for the use of the United States Government in time of war or national emergency." 46 U.S.C. § 1151(b) (1976).

Proceeding forward in time to events underlying the present controversy, on September 8, 1971 U. S. Lines entered into a berth line time charter party with the Military Sealift Command, Department of the Navy (hereinafter "MSC") (JA 555–581). Especially significant is Article 6, "Trading Limits," which reads in full text as follows, including a subsequently-interlineated clause indicated in brackets:

> Trading limits shall be worldwide, [,Including coastal and intercoastal,] but Charterer agrees to notify the Owner as soon as practicable, if the Vessel is sent beyond the limits of American Institute Trade Warranties and to reimburse the Owner for the actual extra cost of marine insurance occasioned by the Vessel's trading beyond such limits.

The significance of the interlineated language of the charter party agreement in relation to Section 506 of the Act is readily discernible.[1] By its terms, Section 506 requires that owners of CDS-built vessels shall operate such vessels exclusively in foreign trade. Operation of CDS-built vessels in domestic trade will subject the vessel owner to imposition of an assessment computed as a proportionate amount of the CDS in relation to the gross revenue derived from the operation of the vessel in domestic trade.

The time charter was for a period of one year or termination of the voyage then under way, with the option of the charterer to continue the charter for twelve additional years in one-year increments (JA 575). This "time provision" of the charter party agreement interfaces with Section 506 of the Act, which provides that the Secretary of Commerce may consent to transfer of the vessel to domestic operations for periods not exceeding six months.[2]

The subject vessel charters, covering a total of fourteen vessels all built with CDS, were entered into pursuant to a call by the MSC for U. S. flag-cargo vessels on June 18, 1971, for the purpose of transporting U. S. military cargo during the period of national emergency. Another vessel owner, Moore-McCormack Lines, Inc., responded to the call and entered into a time charter party with the MSC (JA 660). In contrast to the "trading limits" provision of appellant's time charter party agreement, the Moore-McCormack agreement contained a clause prohibiting the MSC from using the vessel in domestic trade. Neither the U. S. Lines charter party agreement nor the Moore-McCormack charter party agreement contained a provision for reimbursement to the vessel owners in the event that repay-

1. The pertinent portion of § 506 of the Merchant Marine Act, 1936, reads as follows:

Every owner of a vessel for which a construction-differential subsidy has been paid shall agree that the vessel shall be operated exclusively in foreign trade, or on a round-the-world voyage, or on a round voyage from the west coast of the United States to a European port or ports which includes intercoastal ports of the United States, or a round voyage from the Atlantic coast of the United States to the Orient which includes intercoastal ports of the United States, or on a voyage in foreign trade on which the vessel may stop at the State of Hawaii, or an island possession or island territory of the United States. . . .

2. The pertinent portion of § 506 of the Act reads as follows:

The Secretary [of Commerce] may consent in writing to the temporary transfer of such vessel to service other than the service covered by such agreement [viz., the agreement to operate exclusively in foreign trade] for periods not exceeding six months in any year, whenever the Secretary [of Commerce] may determine that such transfer is necessary or appropriate to carry out the purposes of this chapter. Such consent shall be conditioned upon the agreement by the owner to pay to the Secretary [of Commerce], upon such terms and conditions as he may prescribe, an amount which bears the same proportion to the construction-differential subsidy paid by the Secretary [of Commerce] as such temporary period bears to the entire economic life of the vessel. . . .

ments of CDS were assessed against the vessel owners on account of operation of the vessels in domestic trade by the MSC.

On October 8, 1976 the Maritime Administration, Eastern Region Office (hereinafter "MarAd") determined that appellant was required to make repayment of CDS in accordance with Section 506 for the period 1971–1975, during which time appellant's vessels had been under time charter to the MSC (JA 500). Further assessments of CDS were rendered by MarAd on June 16, 1977, covering the 1976 charter period (JA 501), and on December 20, 1978, covering the 1977 charter period (JA 502). U. S. Lines instituted an appeal of the October 1976 decision with the office of the Assistant Secretary for Maritime Affairs (JA 503). In September 1977 an appeal of the 1976 assessment was instituted (JA 505) and, in May 1979, U. S. Lines appealed the assessment of CDS repayment for the year 1977 (JA 507).

In a final opinion and order dated July 27, 1979 and served on August 3, 1979, the Assistant Secretary of Commerce for Maritime Affairs affirmed the determination of the Regional Office, which held that Section 506 of the Act applies to operation of vessels under time charter to the MSC (JA 509).[3] The opinion addressed two major contentions of U. S. Lines which are advanced on this appeal; namely, (1) that the restrictions of Section 506 are not compatible with effective deployment of CDS-built vessels as auxiliaries to the military, and (2) that strict application of the geographic restrictions imposed by Section 506 could have the effect of severely limiting military deployment of CDS-built vessels.

The Assistant Secretary disagreed with appellant on both points. As to the first contention, the Assistant Secretary concluded that the restrictions imposed by Section 506 of the Act served to protect non-subsidized domestic trade and that this goal of

the Act was entirely reconcilable with the other goal of the Act to ensure a military auxiliary fleet. The Assistant Secretary also rejected U. S. Lines' contention that military use of CDS-built vessels was non-commercial in nature and, accordingly, was not a threat to domestic trade carried on by non-subsidized vessels. He concluded that the charter between the vessel owner and the United States was a purely commercial transaction and the same in substance as any other contractual relationship between the United States and private suppliers of goods and services.

U. S. Lines' second line of attack was also dismissed as meritless. First, the Assistant Secretary opined that the fears of U. S. Lines that the military would be hampered in its development of CDS-built vessels had not been borne out in reality. Secondly, he pointed out that the military had several alternatives by which to deploy vessels for its use.

On June 11, 1980, U. S. Lines filed a complaint in the United States District Court for the District of Columbia, seeking review of the administrative action. U. S. Lines alleged that the Assistant Secretary's decisions were erroneous, arbitrary, and capricious. It sought an order declaring the actions of the Assistant Secretary to be unlawful, vacating the decisions with respect to CDS repayment, and permanently enjoining defendants from seeking to enforce any claim for CDS repayments resulting from use of its vessels by the United States in carrying military cargo. The parties filed cross-motions for summary judgment; the District Court (Corcoran, J.) entered judgment in favor of defendants. That order was subsequently amended to reflect the amount of the award (JA 127).

## II. DISCUSSION

For the reasons stated below this court affirms the Assistant Secretary's interpre-

---

**3.** In a subsequent final opinion and order served on May 2, 1980, the Assistant Secretary addressed two issues which had been reserved in the August 3, 1979 decision for later determination. The specific matters resolved in that final opinion and order are not before this court, except to the extent that their resolution depended upon the earlier decision of the Assistant Secretary, which interpreted § 506 of the Act to apply to military time charters of CDS-built vessels.

tation of Section 506 of the Merchant Marine Act, 1936.

There is no dispute that the Merchant Marine Act of 1936 was intended to foster and promote a merchant marine "sufficient to carry ... domestic water-borne commerce and ... capable of serving as a naval and military auxiliary in time of war or national emergency ...." Section 101, 46 U.S.C. § 1101 (1976). Appellant urges that this so-called "great purpose" of the Act will be undermined if Section 506 of the Act is construed to allow unrestricted use of military-chartered CDS-built vessels in domestic trade while, at the same time, to require subsidy repayments in connection with such domestic use.

In this proceeding appellant has assumed the role of defender of the military against an interpretation of Section 506 which, in its lone view, would severely limit the ability of the military to employ CDS-built vessels in domestic trade. Interestingly, and significantly, neither the Military Sealift Command nor the Maritime Administration has advanced this argument, nor has the Department of Defense rallied to the side of U. S. Lines in decrying the serious threat to maintenance of a naval auxiliary that would follow as a result of making Section 506 applicable to military time charters.

In response to this perceived threat, appellees have pointed out that the military has ample means available to it by which to deploy vessels to meet its transportation needs, ranging from outright requisition and purchase of CDS-built vessels under Section 902 of the Act, to chartering of non-CDS-built vessels. In short, there simply is no concrete evidence that the threat to military use of CDS-built vessels for military operations has been, or will be, realized by application of the CDS repayment provision of Section 506 to military use of these vessels.

■ The starting point in construing the statutory provision is the language of the statute. It is true, in principle, that statutory restrictions are not to be applied against activities of the federal government unless plainly required by the statute. *FPC*

*v. Tuscarora Indian Nation*, 362 U.S. 99, 120, 80 S.Ct. 543, 555, 4 L.Ed.2d 584 (1960); *United States v. United Mine Workers of America*, 330 U.S. 258, 272–73, 67 S.Ct. 677, 685–86, 91 L.Ed. 884 (1947). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Higgins v. Marshall*, 584 F.2d 1035, 1037 (D.C.Cir.1978). This court has already held that the financial consequences of invoking the exceptions of Section 506 are as precise as the exceptions themselves. *Alaska Bulk Carriers, Inc. v. Kreps*, 595 F.2d 814, 822 (D.C.Cir.1979), *rev'd on other grounds sub nom. Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980).

■ Appellant urges that the congressional intent is contrary to the plain words of the statute. U. S. Lines states that the paucity of reference in the legislative history of the Act with regard to application of Section 506 to the federal government's use of CDS-built vessels is indicative of congressional intent not to limit operation of CDS-built vessels chartered to the military to foreign trade. There simply is no quarreling with the basic premise that Congress had intended that CDS-built vessels could be used by the military in domestic trade. However, this court cannot accept appellant's corollary argument that Congress had not intended the repayment provisions of Section 506 to be applied to military use of CDS-built vessels. Congress' silence on this matter, which appellant characterizes as of compelling importance, is strong evidence that it perceived no threat to the military's ability to charter CDS-built vessels, taking into full account the application of Section 506 to such charters. Appellant has failed to demonstrate that congressional intent is contrary to the language of the statute and, therefore, the court is bound to apply the statute according to its plain meaning. *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917).

■ The court further concludes that the assessments of CDS repayments against U. S. Lines were lawful. Obscured by appellant's draconic attempt to wage battle on behalf of the military against application of Section 506 to military time charters is the plain fact that appellant could have bargained for and exacted indemnification by the Military Sealift Command for any CDS repayments assessed against it. U. S. Lines candidly admits that Moore-McCormack Lines had bargained for a charter party agreement provision which prohibited use of its two vessels in domestic trade and that, upon breach of that provision, the MSC made Moore-McCormack whole. In the final analysis, the dispute over repayments of CDS might not have been elevated to the present level had U. S. Lines been more prudent in contracting for the charter of its vessels.

## III.  CONCLUSION

For all of the foregoing reasons, the judgment of the District Court granting appellees' cross-motion for summary judgment, thereby affirming the orders of the Assistant Secretary of Commerce for Maritime Affairs challenged in this case, is

*Affirmed.*