# Applicability of the Cargo Preference Act to the Transportation of Alaskan Oil to the Strategic Petroleum Reserve

Shipments of Alaskan oil for the Strategic Petroleum Reserve, made on commercial United States-flag ships as required by the Jones Act, 46 U.S.C. § 883, may be counted by the Department of Energy towards the 50% United States-flag cargo preference share required by the Cargo Preference Act, 46 U.S.C. § 1241(b).

The Cargo Preference Act, 46 U.S.C. § 1241(b), applies to both foreign and domestic cargoes procured by the United States, and is not limited to commerce in which United States-flag vessels face foreign competition. In addition, the Act is an "otherwise applicable Federal procurement statute" that may be waived by the Secretary of Energy under § 804(b) of the Energy Security Act, 10 U.S.C. § 7340(k).

September 15, 1983

MEMORANDUM OPINION FOR THE SECRETARY OF TRANSPORTATION
AND THE SECRETARY OF ENERGY

This responds to your joint request to the Attorney General for an opinion on the following question:

> Whether commercial United States-flag oil shipments to the Strategic Petroleum Reserve from Alaska may be counted towards the 50% United States-flag cargo preference share required by the Cargo Preference Act.

Under the terms of an interagency agreement, you agreed to submit this question to the Attorney General in order to resolve a dispute between your two Departments. The Attorney General has referred your request to this Office for decision.

For the reasons set forth below, we conclude that shipments of Alaskan oil for the Strategic Petroleum Reserve, made on commercial United States-flag ships as required by the Jones Act, 46 U.S.C. § 883, may be counted towards the 50% United States- flag cargo preference share required by the Cargo Preference Act, 46 U.S.C. § 1241(b).

In addition, the Department of Energy (DOE) has asked us to address two related questions:

> Where oil produced from the Naval Petroleum Reserves is exchanged for other oil to be delivered to the Strategic Petroleum

139

Reserve, pursuant to § 804(b) of the Energy Security Act, 10 U.S.C. § 7430(k), may the exchange be conducted without regard to the Cargo Preference Act, and the deliveries excluded from the 50% United States-flag compliance calculation under that Act?

Does the Cargo Preference Act require that the Department of Energy and its procurement agents at the Department of Defense, in future oil deliveries to the Strategic Petroleum Reserve, make up any past year shortfalls from the Act's 50% United States-flag standard?

The Department of Transportation (DOT) takes the view that the two additional questions submitted by DOE are covered by the interagency agreement between DOT and DOE, and therefore no outstanding dispute exists between the two agencies with respect to those questions. In an effort to provide as much guidance as possible to both agencies, we address below the strictly legal issues raised by DOE's separate questions. That legal analysis, however, does not dispose of the problem, because your agencies take different views as to the scope and intent of their obligations as agreed upon in the interagency agreement. We are not in a position to interpret that agreement and do not attempt to do so here. We recommend that, if you cannot resolve your differing interpretations of the agreement, the matter be referred to appropriate higher levels in the Executive Branch.

In analyzing the questions presented to us, we have examined the views of each of your departments, the views of the Office of Management and Budget, and our independent research.

I

The questions we consider here arise out of the interplay between DOE's obligation to comply with congressional mandates to fill the Strategic Petroleum Reserve (SPR), a stockpile of crude oil intended to provide protection against interruption in energy supplies to the United States, and its obligations and authority under three other statutes: (a) the Cargo Preference Act, 46 U.S.C. § 1241(b); (b) the Jones Act, 46 U.S.C. § 883; and (c) the Energy Security Act, 10 U.S.C. § 7430(k). We outline below the relevant portions of each of those statutes.[1]

---

[1] The SPR was authorized by Title I, Part B, of the Energy Policy and Conservation Act, Pub. L. No. 94–163, 89 Stat. 881–90 (1975) (codified at 42 U.S.C. §§ 6231–6422). Congress has repeatedly legislated with respect to the fill rate for the SPR. See Pub. L. No. 97–35, Title X, 95 Stat. 619 (1981); Pub. L. No. 96–294, § 801, 94 Stat. 775 (1980); Pub. L. No. 96–514, 94 Stat. 2964 (1980). Most recently, in the Energy Emergency Preparedness Act of 1982, Pub. L. No. 97–229, § 4, 96 Stat. 250–52, Congress required the President to fill the SPR at a rate of 300,000 barrels per day unless he finds that this rate is not in the national interest, in which event the minimum required fill rate is 220,000 barrels per day if appropriations are available to achieve this rate, or the highest practicable fill rate that would fully use available appropriations. DOE is responsible for administration of the SPR, including the acquisition, transportation, and storage of crude oil. See 42 U.S.C. §§ 6233, 6240. Pursuant to an interagency agreement, the Defense Fuel Supply Center acts as the Department of Energy's procurement agent and actually solicits offers and awards contracts (with DOE's approval) for the acquisition of oil.

140

## A. Cargo Preference Act

Ocean shipments of crude oil for the SPR are generally subject to the requirements of the Cargo Preference Act, Pub. L. No. 83–664, 68 Stat. 832 (1954) (codified as amended at 46 U.S.C. § 1241(b)).[2] The Act provides in pertinent part that:

> Whenever the United States shall procure, contract for, or otherwise obtain for its own account, or shall furnish to or for the account of any foreign nation without provision for reimbursement, any equipment, materials, or commodities, within or without the United States, or shall advance funds or credits or guarantee the convertibility of foreign currencies in connection with the furnishing of such equipment, materials, or commodities, the appropriate agency or agencies shall take such steps as may be necessary and practicable to assure that at least 50 per centum of the gross tonnage of such equipment, materials, or commodities . . . which may be transported on ocean vessels shall be transported on privately owned United States-flag commercial vessels, to the extent such vessels are available at fair and reasonable rates for United States-flag commercial vessels, in such manner as will insure a fair and reasonable participation of United States-flag commercial vessels in such cargoes by geographic areas.

Thus, the Cargo Preference Act requires DOE to take "such steps as may be necessary and practicable to assure that at least 50 per centum" of oil for the SPR that is transported on ocean vessels be transported on United States-flag commercial vessels, if such vessels are available at fair and reasonable rates for United States-flag commercial vessels.

## B. Jones Act

Although most of the oil shipped to the SPR has been obtained from foreign sources, such as the Persian Gulf, the North Sea, North Africa, and the Caribbean, a substantial volume was shipped, particularly in 1981, from the Alaskan North Slope Fields via Valdez, Alaska, to SPR receiving docks in Texas and Louisiana.[3] Because these shipments of Alaskan oil took place between United States ports, they were subject to the Jones Act, Act of June 5, 1920, ch. 250, 41 Stat. 988, 999 (codified as amended at 46 U.S.C. § 883).[4] The Jones Act provides in relevant part that:

[2] The Cargo Preference Act added a new subparagraph (b) to § 901 of the Merchant Marine Act of 1936, Pub. L. No. 74–835, 49 Stat. 1985.

[3] DOE has informed us that approximately 10 7 percent of oil stored in the SPR as of December 31, 1982, was produced in Alaska.

[4] The Jones Act is one in a series of statutes, beginning in 1789, which have imposed general restrictions on the transportation of freight in coastwise traffic by vessels not owned by citizens of the United States. *See Central Vermont Co.* v. *Durning,* 294 U.S. 33, 38 & n.1 (1935).

> No merchandise shall be transported by water, or by land and water, on penalty of forfeiture thereof, between points in the United States, including Districts, Territories, and possessions thereof embraced within the coastwise laws, either directly or via a foreign port, or for any part of the transportation, in any other vessel than a vessel built in and documented under the laws of the United States and owned by persons who are citizens of the United States, or vessels to which the privilege of engaging in the coastwise trade is extended by section 13 or 808 of this title.

46 U.S.C. § 883. In accordance with the terms of the Jones Act, we understand that shipments of Alaskan oil for the SPR have been made entirely in United States-flag commercial vessels.

## C. Energy Security Act

The Energy Security Act (ESA), Pub. L. No. 96–294, 94 Stat. 611 (1980), was passed in the aftermath of the 1979 Iranian supply disruption, when efforts to fill the SPR fell behind the approved fill schedule and oil purchases for the SPR came to a halt. In the ESA, passed in June 1980, Congress required that the SPR oil fill be resumed and sustained at an average rate of at least 100,000 barrels per day. In order to facilitate this fill rate, Congress authorized the Secretary of Energy to store oil from the Naval Petroleum Reserves (NPR)[5] in the SPR, or to:

> (B) exchange, directly or indirectly, that petroleum [from the NPR] for other petroleum to be placed in the Strategic Petroleum Reserve under such terms and conditions and by such methods as the Secretary determines to be appropriate, without regard to otherwise applicable Federal procurement statutes and regulations.

Pub. L. No. 96–294, § 804(b), 94 Stat. 777 (1980) (codified at 10 U.S.C. § 7430(k)(1)). In 1980 and 1981 DOE used the authority in the ESA to place in the SPR a substantial amount of crude oil that had been exchanged for NPR oil.

## II

### A. Applicability of the Cargo Preference Act to Jones Act Cargoes

The question you have jointly referred to us for decision is whether shipments of Alaskan oil — 100 percent of which were made in United States-flag commercial vessels pursuant to the Jones Act — may be counted towards the 50 percent Cargo Preference Act share for the SPR program. DOT takes the

---

[5] The Naval Petroleum Reserves include several specific crude oil or petroleum reserves designated originally by executive order and now specifically authorized by 10 U.S.C. §§ 7420–7438. In general, the reserves may be used for production of petroleum only if specifically authorized by joint resolution of Congress and approved by the President. *Id.* § 7422(b).

position that the Cargo Preference Act reserves 50 percent of foreign oil transported to the SPR for United States-flag tankers, and asserts that DOE must base its Cargo Preference Act compliance calculation only on foreign shipments. DOT maintains that the purpose and legislative intent of the Cargo Preference Act is to reserve 50 percent of government-generated cargo for United States-flag vessels in commerce in which the United States vessels face competition from foreign-flag vessels, *i.e.,* import or export foreign commerce. Because foreign-flag vessels are already excluded by operation of the Jones Act from domestic trade, DOT contends that government-procured or owned cargoes shipped in such commerce should not be included in the calculation of Cargo Preference Act compliance. DOT points out that the effect of allowing Jones Act cargoes to be included in the Cargo Preference Act calculation would be to reduce the share of foreign trade that must be reserved to United States-flag commercial ships — a result DOT contends is "entirely inconsistent" with the purpose of the Cargo Preference Act.

DOE's position is that the plain language of the Cargo Preference Act covers all government-procured or owned cargoes, which would include Alaskan oil shipments, and that, while the Act may have been passed primarily to deal with foreign cargoes exported from or imported into the United States, the legislative history of the Act does not demonstrate any clear congressional intent to limit that language to foreign cargoes. As a policy matter, DOE maintains that exclusion of Alaskan oil shipments from the calculation of its Cargo Preference Act share for the SPR program would substantially increase the overall cost of acquisition of oil for the SPR, inconsistently with the goal of minimizing the cost of the SPR, *see* 42 U.S.C. § 6231,[6] particularly if DOE is required to make up shortfalls from the 50 percent level for prior years.[7]

The question is a close and novel one, and the arguments made in support of both positions have been skillfully presented and have considerable merit. After a careful review of the memoranda provided to us, an independent review of the legislative history of the Cargo Preference Act, and additional research, we conclude that DOE may include Jones Act shipments of Alaskan oil in the calculation of its overall 50 percent Cargo Preference Act compliance level for the SPR program.

---

[6] Although DOE notes that "minimization of the cost of the Reserve" is an objective set forth in the Energy Policy and Conservation Act, 42 U.S.C. §§ 6231–6422, it does not assert that the SPR program itself has been exempted from the Cargo Preference Act.

[7] For calendar year 1982 alone, DOE calculates that it would be in compliance with the Cargo Preference Act, whether or not Alaskan oil shipments are counted. For the years 1981–82, DOE states that it would be in compliance with the Cargo Preference Act 50 percent share if Alaskan oil shipments were included; if such shipments were excluded, the share of SPR oil shipments carried in United States flag-commercial vessels would fall to roughly 39 percent. For the period 1977–1982, covering most of the acquisition for the SPR, the Cargo Preference Act compliance percentage including Alaskan shipments would be either 48.9 percent (if Naval Petroleum Reserve exchanges are excluded, *see* below) or 46.3 percent (if Naval Petroleum Reserve exchanges are included); without Alaskan oil shipments, the compliance figure would be 41.9 percent (excluding Naval Petroleum Reserve exchanges) or 38.6 percent (including Naval Petroleum Reserve exchanges). To the extent DOE is required to make up any shortfall from the 50 percent level, it would have to do so by using relatively expensive United States commercial vessels, which would increase the overall cost of SPR acquisitions.

Our touchstone in reaching that conclusion is "the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania,* 447 U.S. 102, 108 (1980); *see also United States v. Turkette,* 452 U.S. 576, 580 (1981); *United States Lines, Inc. v. Baldridge,* 677 F.2d 940, 944 (D.C. Cir. 1982).

On its face the language of the Cargo Preference Act covers all government-procured or owned cargoes transported on ocean vessels, which would include government cargoes transported between United States ports, as well as cargoes transported to or from a foreign port. The Act applies *"[w]henever* the United States shall procure . . . equipment, materials, or commodities *within or without* the United States." 46 U.S.C. § 1241(b) (emphasis added). The Act carves out certain explicit exceptions to the 50 percent United States-flag vessel requirement, but does not make any specific exception for cargo that is subject to the Jones Act 100 percent United States-flag requirement, or any general exception for cargoes transported in trades in which there is, by operation of statute, no foreign competition.[8]

DOT urges that we must interpret that language in light of the Act's legislative history, which DOT maintains demonstrates a clear congressional intent that the 50 percent United States-flag requirement should apply only to cargoes shipped in trades in which the United States vessels face foreign competition. In order to reach the conclusion advocated by DOT, we would have to infer a further exception, in addition to the explicit exceptions in the Act, for Jones Act cargoes. DOT suggests that the implied exception would cover only cargoes that must be transported in United States vessels pursuant to the first clause of the Jones Act; DOT takes the position that domestic shipments that may be made in foreign vessels, pursuant to the third proviso of the Jones Act, would be covered by the general language of the Cargo Preference Act.[9]

In general, we find the legislative history of the Cargo Preference Act to be inconclusive on the question of congressional intent. We are unwilling on the basis of that history to infer a specific exception, from the broad language used by Congress, for government cargoes that are otherwise subject to the Jones Act.[10]

---

[8] Specifically, the Act does not apply to cargoes carried in vessels of the Panama Canal Company, or to certain vessels rebuilt abroad, if the owner notified the Maritime Administration prior to September 21, 1961, of its intent to document the vessel under United States registry. 46 U.S.C. § 1241(b).

[9] The third proviso of the Jones Act exempts from the exclusive United States-flag transportation requirement "merchandise transported between points within the continental United States, including Alaska, over through routes . . . recognized by the Interstate Commerce Commission for which routes rate tariffs have been or shall . . . be filed with [the ICC] when such routes are in part over Canadian rail lines and their own or other connecting water facilities." 46 U.S.C. § 883.

[10] We note that, as a general matter of statutory construction, implied exceptions are disfavored, especially if the statute contains an express exception. *See, e.g., Consumer Product Safety Comm'n v. GTE Sylvania,* 447 U.S. at 108; *Andrus v. Glover Constr. Co.,* 446 U.S. 608, 616–17 (1980); *see generally* 2A Sands, *Sutherland on Statutory Construction* (4th ed. 1973). This principle would not necessarily preclude us, in a proper case, from reading particular statutory language narrowly in order to implement clear congressional intent. However, as we discuss above, the legislative history of the Cargo Preference Act is not clear on this point, and we are therefore unwilling to infer the exception DOT suggests.

As DOT points out and DOE acknowledges, the primary impetus for passage of the Cargo Preference Act was to promote the United States shipping industry against low-cost competition from foreign flag vessels, by reserving to United States-flag vessels a "substantial portion" of cargoes over which the United States has some control. DOT notes that the congressional debates and reports on S. 3233, which became the Cargo Preference Act, contain numerous statements emphasizing that the purpose of the bill was to assure to privately owned United States merchant flag vessels a "substantial portion of the water-borne export and import foreign commerce," in which those vessels faced massive foreign competition. *See, e.g.,* S. Rep. No. 1584, 83d Cong., 2d Sess. 1 (1954); H.R. Rep. No. 2329, 83d Cong., 2d Sess. 1 (1954); 100 Cong. Rec. 4158–59 (1954) (remarks of Sen. Butler).

These statements, however, do not necessarily indicate that Congress intended that the bill, despite its broad language, would apply *only* to commerce in which United States-flag vessels face foreign competition.[11] We find it significant that the bill was intended to apply to two distinct types of cargoes: foreign-aid cargoes that are furnished or financed by the United States for the benefit of another nation, which necessarily will be "foreign" cargoes, and cargoes procured by the United States for its own use, which as a practical matter could be foreign or domestic. Most of the legislative history focuses on the first type of cargo, and therefore emphasizes that the primary applicability of the bill would be with respect to foreign- cargoes.[12]

The language used in the legislative history to describe the obligations imposed with respect to cargoes obtained by the United States for its own use, however, is not restricted to foreign cargoes. For example, the House Report states that the bill would apply in four situations:

(1) Where the United States procures, contracts, or otherwise obtains for its own account equipment, materials, or commodities;

---

[11] In support of its reading of the legislative history and purpose of the Cargo Preference Act, DOE cites recent statements made by Senator Slade Gorton, Chairman of the Senate Commerce Committee's Merchant Marine Subcommittee, during the Subcommittee's June 16, 1982 oversight hearings on administration of the Act, as well as recent correspondence from the chairman and ranking member of the House Merchant Marine and Fisheries Committee and the chairmen of the House Committee on Energy and Commerce Subcommittee on Fossil and Synthetic Fuels. Although these statements might reflect the views of those particular legislators on whether Jones Act shipments should, as a matter of *current* legislative policy, be included in Cargo Preference Act calculations, they may not be accorded significant weight in determining Congress' intent when it passed the Cargo Preference Act in 1954. Even contemporaneous remarks of individual legislators are not controlling in analyzing legislative intent. Moreover, the "views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Consumer Product Safety Comm'n v GTE Sylvania,* 447 U.S. at 117 (quoting *United States* v. *Price,* 361 U.S. 304, 313 (1960)).

[12] For example, the legislative history behind inclusion of the phrase "within or without the United States" emphasizes that Congress' primary purpose was to reach "off-shore procurement" foreign-aid cargoes — *i.e.,* situations in which the United States purchased or financed the purchase of cargoes in one foreign country, for shipment to another foreign country. *See, e.g.,* 100 Cong. Rec. 4158–59 (1954) (remarks of Sen. Butler). The language "*without* the United States" was intended to assure that the transportation of such cargoes would be subject to the 50 percent preference requirement. This legislative history is not, however, necessarily inconsistent with the conclusion that the 50% preference share might also apply to domestic cargoes, but rather reflects Congress' principal focus on foreign aid-type cargoes. *See generally United States Lines, Inc.* v. *Baldridge,* 677 F.2d at 944.

(2) furnishes equipment, materials, or commodities to or for the account of any foreign nation without provision for reimbursement;

(3) advances funds or credits; or

(4) guarantees the convertibility of foreign currencies in connection with the furnishing of such equipment, materials, or commodities.

H.R. Rep. No. 2329, *supra,* at 1–2. There is no suggestion in the language used to describe government-procured or owned cargoes that the reach of the Act must be limited to *foreign* cargoes procured by the United States.

In fact, there is some indication in the legislative history that Congress was aware that the Act could apply to cargoes acquired domestically by the United States for its own use. The Senate Report notes that the bill affirmed the principle established by Congress in 1904, when it required that "vessels of the United States or belonging to the United States, and no others, shall be employed in the transportation by sea of coal, provisions, fodder, or supplies of any description, purchased pursuant to law, for the use of the Army or Navy," Act of Apr. 28, 1904, ch. 1766, 33 Stat. 518, *as amended,* 70A Stat. 146 (1956) (codified at 10 U.S.C. § 2631). *See* S. Rep. No. 1584, *supra,* at 2. The 1904 legislation, which was not repealed by the 1954 Cargo Preference Act, is clearly not limited to transportation of foreign cargoes, but applies also to cargoes acquired domestically by the Army or Navy. *See generally* 38 Cong. Rec. 2464–65 (1904) (remarks of Rep. Perkins) (*quoted in* 43 Comp. Gen. 792, 797–98 (1964)).

Our conclusion that the language of the Cargo Preference Act applies to domestic, as well as foreign, cargoes has some support in a 1964 decision of the Comptroller General with respect to application of the 1904 act cited above, the Cargo Preference Act, and the Jones Act to a proposed trainship service between the United States and Alaska, via Canada. With respect to the applicability of the Cargo Preference Act, the Comptroller General stated that:

> The 1954 Cargo Preference Act by amending section 901 of the Merchant Marine Act of 1936, 49 Stat. 2015, 46 U.S.C. § 1241, provided permanent legislation covering the transportation of a substantial portion of waterborne cargoes in United States-flag vessels. In H. Rept. No. 80, Administration of Cargo Preference Act, 84th Congress, 1st Sess., page 2, it is stated that the 50–percent provisions of the 1954 Cargo Preference Act are to apply "in four kinds of situations" the first being where the United States "procures, contracts or otherwise obtains for its own account equipment, materials, or commodities," and the remaining three covering transactions involving foreign subjects or nations. *This first situation is not restricted in terms to either foreign or domestic commerce.* In harmony with the basic maritime policy of the United States as stated in section 101 of

146

> the Merchant Marine Act of 1936, 46 U.S.C. § 1101, and on the
> basis of the language alone, *the 1954 act might be regarded as
> relating to Government waterborne cargo transported between
> points in the United States.*

43 Comp. Gen. 792, 802 (1964) (emphasis added). The Comptroller General did not, however, find it necessary in that decision to determine whether the Act covers transportation in domestic, as well as foreign commerce.

We do not find persuasive DOT's further argument that inclusion of Jones Act cargoes in the calculation of DOE's Cargo Preference Act share for the SPR program would be so inconsistent with the purpose of the Cargo Preference Act that we must imply an exception from that Act for Jones Act shipments. The purpose of both acts, however it may be characterized, is the same: to reserve cargoes for United States-flag vessels in order to promote and protect the United States shipping industry, which may be called upon in times of war or national emergency to play a vital sealift role in supplying American forces. The Cargo Preference Act achieves this purpose by requiring United States agencies to reserve a substantial portion of their cargoes for United States-flag commercial vessels. The Jones Act achieves that purpose by reserving all domestic coastwise trade to United States vessels.[13] In practical terms, we understand that allowing Jones Act cargoes of Alaskan oil to be counted in DOE's Cargo Preference Act share for the SPR program may disadvantage United States-flag tankers in the foreign crude oil trades, because inclusion of Jones Act shipments would lower the percentage of foreign oil cargoes that must be shipped on United States vessels in order to reach the 50 percent Cargo Preference Act share. However, we do not understand that the effect of inclusion of the Jones Act shipments will be so great as to undermine or frustrate the purposes served by the Cargo Preference Act, and we cannot say that this result is so contrary to Congress' intent in enacting the Cargo Preference Act that it would justify an Executive Branch revision of the statutory language. *See generally United States v. American Trucking Ass'n,* 310 U.S. 534, 543 (1940). DOT has also argued that, as a matter of statutory construction, the Cargo Preference Act must be interpreted to cover only cargoes transported in trades in which United States-flag ships face foreign competition, because the Act would be unnecessary in a domestic trade from which foreign-flag vessels are already excluded. Therefore, DOT contends, it would be "inconsistent with accepted norms of statutory construction to interpret the Cargo Preference Act to apply to a trade where it was unneeded." The question we address here, however, is not whether, when the United States procures cargoes that are

---

[13] We see no reason here to address the effect of the Attorney General's opinion in 1907 that a predecessor statute to the Jones Act did not apply to government-owned cargoes. *See* 26 Op. Att'y Gen. 415 (1907). The applicability of that opinion to the Jones Act and its continued validity is, as DOT notes, open to some question. DOE states, however, that the Alaskan oil acquired for the SPR was bought on an f.o.b. destination basis, so that title was held during the transportation by the private owner and not by the United States Government. The Jones Act clearly applies to transportation of privately owned cargoes, and therefore applied to the transportation of SPR oil.

subject to the Jones Act, it must also comply with the Cargo Preference Act. If that were the question, we might concur with DOT's analysis, because it would arguably be superfluous to require compliance with the Cargo Preference Act's 50 percent United States-flag ship requirement in a situation in which the Jones Act already requires 100 percent United States-flag ship carriage. However, the question we address is whether, when the United States engages in a program of acquisition that includes both Jones Act and non-Jones Act shipments, it may count the Jones Act shipments towards its overall Cargo Preference Act share. Seen in that light, we do not believe the Cargo Preference Act can be regarded as superfluous, because it would still require the agency to take necessary and practicable steps to reach an overall 50 percent compliance level.[14]

In sum, while the arguments made by DOT in support of its interpretation of the Cargo Preference Act have considerable merit, we believe in this case that the plain language of the statute should prevail. Therefore, it is our opinion that shipments of Alaskan oil by or on behalf of DOE for the SPR may be counted in calculation of DOE's Cargo Preference Act share for the SPR program.

## B. Exchange of NPR Oil

The first of the two questions posed separately by DOE also arises out of the SPR program, but involves interpretation of the language of § 804(b) of the Energy Security Act (ESA), codified at 10 U.S.C. § 7430(k), that allows the Secretary of Energy to exchange oil from the NPR for oil to be placed in the SPR "without regard to otherwise applicable Federal procurement statutes and regulations." The question posed by DOE is whether the Cargo Preference Act may be considered to be an "otherwise applicable Federal procurement statute" within the meaning of § 804(b) of the ESA, which may therefore be waived by the Secretary of Energy.

We concur with DOE's legal conclusion that, at least for the purpose of § 804(b), the Cargo Preference Act would be an "otherwise applicable Federal procurement statute," which may be waived by the Secretary of Energy if he determines that application of the Cargo Preference Act would hamper efforts to exchange NPR oil for other oil to be placed in the SPR.[15] Although the terms of the Cargo Preference Act do not expressly characterize the Act as a "procurement" statute, the Act applies, *inter alia,* when the United States "procures" goods to be transported by ocean vessels. *See* 46 U.S.C. § 1241(b). Certainly in practical terms the Cargo Preference Act regulates the government's procurement of ocean transportation services and the transportation by vessel

[14] In fact, it appears to us to be possible that some shipments made between domestic ports could be carried on foreign-flag vessels, pursuant to the third proviso of the Jones Act or to waivers of the Jones Act requirements. DOT has noted that, upon occasion, Jones Act waivers have been granted for government-owned cargo. In that event, it would clearly not be superfluous to apply the Cargo Preference Act to those domestic cargoes, in order to assure a 50 percent overall share to United States-flag vessels.

[15] We do not suggest here that the Cargo Preference Act would necessarily also be considered a "Federal procurement statute" under a different statutory scheme.

of commodities procured by the government, and is an integral part of the acquisition process.[16]

In addition, the purpose of the waiver authority in § 804(b) supports the conclusion that the Cargo Preference Act can be considered a "procurement statute" for the purpose of exchanges of NPR oil. Although the legislative history of the ESA does not list or otherwise describe in detail what is included in the term "Federal procurement statutes and regulations," the purpose of the waiver authority is clearly to grant the Secretary of Energy sufficient flexibility to use the exchange authority effectively to meet the pressing need to increase the fill rate of the SPR. *See* H.R. Rep. No. 1104, 96th Cong., 2d Sess. 317–18 (1980). To the extent that it regulates some aspect of the acquisition process, and could substantially frustrate efforts by the Secretary of Energy to use the authority granted in the ESA to exchange NPR oil, we believe the Cargo Preference Act is a "procurement" statute covered by the ESA. Therefore if, in the Secretary of Energy's judgment, limiting the NPR exchange in order to assure 50 percent Cargo Preference Act shipping would have frustrated the objectives of the ESA, reliance on the waiver authority in § 804(b) to permit the exchange without regard to the Cargo Preference Act would be consistent with the letter and the spirit of the ESA. Any resulting shortfall in meeting Cargo Preference Act requirements for the NPR exchange should thus not be counted as a Cargo Preference Act deficiency.

We take no view, however, as to whether the Secretary of Energy has actually waived or could yet waive applicability of the Cargo Preference Act to NPR exchanges that have already taken place. DOT takes the position that the ocean transportation of foreign oil delivered to the SPR in exchange for NPR oil was included in calculating DOE's existing obligations under the interagency agreement, and therefore DOE cannot now maintain that such exchanges should be excluded from calculation of its Cargo Preference Act compliance for past years. DOE asserts that the agreement does not address treatment of NPR exchanges, and therefore that the Secretary of Energy is not barred by the agreement from exercising his waiver authority.[17]

---

[16] The definition of the term "procurement" as used in the Federal Procurement Policy Act Amendments of 1979, Pub. L. No. 96–83, § 3, 93 Stat. 649 (41 U.S.C. § 403(b)), is certainly broad enough to cover the Cargo Preference Act. That definition reads as follows:

> As used in this chapter the term "procurement" includes all stages of the acquisition process, beginning with the process for determining a need for property and services through to the Federal Government's disposition of such property and services.

Similarly, the definition of "procurement" contained in the Federal Procurement Regulations includes the "acquisition (and directly related matters) . . . of personal property and non-personal services," which would also appear broad enough to cover Cargo Preference Act requirements. FPR § 1–1.209. Finally, we note that rules governing Cargo Preference Act compliance are included in the Federal Procurement Regulations and the Defense Acquisition Regulations. FPR § 1–19.108–2; DAR § 1–1404.

[17] DOE does not address whether the Secretary has in fact exercised that authority for some or all NPR exchanges, or what action would be necessary to exercise that authority. We understand from conversations with DOE that no official waiver action was taken at the time the NPR exchange cargoes were acquired. Section 804(b) of the ESA does not explicitly require such formal action and, to our knowledge, there are no regulations that establish particular procedures or prerequisites for such waivers. As a matter of logic, however, it seems to us that the waiver authority should be exercised at the time of acquisition of the cargoes,

Continued

149

As we were not privy to the negotiations that led to the interagency agreement, we are not in a position to determine whether the treatment of past NPR oil exchanges was resolved during those negotiations. We recommend that this issue be addressed again by DOE and DOT and, if necessary, resolved at a higher level within the Executive Branch.

## C. Remedies for Shortfalls in Cargo Preference Act Compliance

The second question posed separately by DOE concerns the available remedies under the Cargo Preference Act for a calendar year shortfall in United States-flag vessel shipments. We understand that the Maritime Administration (MarAd), which is the component of DOT responsible for administering the Cargo Preference Act, see 46 U.S.C. §§ 1114(b), 1122(d), took the position in discussions and correspondence with DOE, prior to negotiation of the interagency agreement, that annual shortfalls in meeting the 50 percent United States-flag ship share must be made up in succeeding years. DOT now also asserts that in the interagency agreement DOE agreed, independently of its undertaking to make up its 1981 Cargo Preference Act deficiency and to transport at least 50 percent of foreign oil delivered to the SPR on United States-flag tankers — both of which are contingent to some degree on issuance of our opinion here — that it would carry forward calendar year deficits or surpluses in calculating Cargo Preference Act requirements for United States-flag vessels in future years.

For its part, DOE asserts that it is not required, as a matter of law, to carry deficiencies forward from one year to the next in order to reach the 50 percent level, and that there had been, at least prior to 1980, a "longstanding" agreement between MarAd and DOE that Cargo Preference Act compliance would be measured on a calendar year basis, without carrying forward either a surplus or a deficiency from one year to the next. With respect to the effect of the interagency agreement, DOE maintains that its obligation to carry forward deficits and surpluses is contingent on the issuance of an opinion on the question jointly referred to the Attorney General, and therefore ceases with the issuance of that opinion.

The fundamental disagreement between DOE and DOT as to what they agreed upon in the interagency agreement makes it impossible for us to provide specific guidance to either agency with respect to remedying shortfalls in Cargo Preference Act compliance.[18] Obviously, the method of complying with

---

[17] (. . . continued)
when the Secretary can make a determination that compliance with the Cargo Preference Act for those particular cargoes would frustrate the Department's ability to maintain or increase the SPR fill rate to levels mandated by Congress. We have some doubt that the waiver authority in the ESA was intended to provide a post hoc rationalization for overall programmatic shortfalls in an agency's Cargo Preference Act compliance.

[18] At best, the interagency agreement is ambiguous on this point. Subparagraph 1(D) of the agreement recites in part that "commencing with calendar year 1981, deficits from and surpluses over 50% in the calculation of the SPR's cargo preference obligation will be cumulative, to be carried forward in calculating the requirements for United States-flag vessels in future years." DOE maintains that this obligation is subject

Continued

150

the Act can be a proper matter for negotiation and agreement between MarAd, which is charged with administering the Act, and a federal agency, such as DOE, that ships cargoes subject to the Act. We would not disturb such an agreement unless it were predicated on an incorrect reading of the applicable law and regulations — a conclusion we could not draw with respect to either interpretation advanced here.[19] We are not the appropriate office within the Executive Branch to resolve the questions of fact and policy that should have been addressed by both agencies in the course of negotiation of the interagency agreement, or that must be addressed now in order to resolve the outstanding disagreement between those agencies. We suggest therefore that DOT and DOE attempt to resolve that disagreement in further discussions between the two agencies or, if need be, with the participation of other appropriate Executive Branch officials.

## III

We have considered carefully the thorough presentations by both agencies with respect to the application of the Cargo Preference Act to SPR shipments of

---

[18] (. . . continued)
to the general condition in paragraph 1 that the obligations each agency undertakes last "until such time as the Attorney General may rule affirmatively" on the issue presented by both agencies for decision. Although the structure of the agreement appears to support DOE's position that this general condition was intended to apply to all obligations undertaken in subparagraph (A) through (D) of the agreement, the language used in subparagraph (D) suggests an independent obligation. In addition, if DOE is correct in its interpretation of subparagraph (D), it appears that the subparagraph is largely redundant with subparagraphs (B) and (C), which outline specific remedies for DOE's 1981 Cargo Preference Act shortfall.

[19] We can provide some guidance to both agencies on the issue whether an agency, *as a matter of law,* is required to reach the 50 percent United States-flag ship level established in the Cargo Preference Act. We believe it is clear that the Act does not impose an absolute duty on federal agencies to ship 50 percent of the cargo of a particular program (or of the agency) in United States-flag vessels, regardless of the availability of such vessels or of unforeseen circumstances that might prevent an agency from reaching the 50 percent level. An early version of S. 3233 would have set 50 percent as a mandatory minimum compliance level, by requiring that *"at least 50 per centum* of the gross tonnage  . . which may be transported on ocean vessels *shall be transported* on privately-owned United States-flag commercial vessels." S. Rep. No. 1584, *supra,* at 2 (emphasis added). The bill was subsequently amended, however, to require only that agencies "take such steps as may be necessary and practicable to assure that at least 50 per centum . . .  " *Id.* (emphasis added). In discussing this amendment, Senator Butler, the sponsor of the bill, specifically noted that the "unequivocal provision for shipment of at least 50 percent of all aid or federally owned or financed cargoes was softened to require only such steps as may be reasonable and practicable to assure shipment of at least 50 percent in American bottoms." 100 Cong. Rec. 8228 (1954) (remarks of Sen. Butler). Moreover, the Act by its terms requires 50 percent shipment in United States-flag vessels only "to the extent such vessels are available at fair and reasonable rates for United States-flag commercial vessels." 46 U.S.C. § 1241(b).

The language of the statute, particularly when read in light of its legislative history, therefore clearly contemplates that agencies may not be able to meet the 50 percent level — *i.e.,* if, despite the best efforts of the agency, it could not arrange for 50 percent shipment of its cargo on United States-flag vessels, or if United States-flag vessels were not available for particular shipments at fair and reasonable rates for such vessels. Therefore, we do not believe that, as a matter of law, a federal agency is required to meet an absolute 50 percent minimum in its shipments of cargo subject to the Cargo Preference Act.

If MarAd's position on DOE's obligation to remedy Cargo Preference Act deficits were predicated on the legal assumption that the Act *requires* DOE to reach a minimum 50 percent United States-flag vessel share for the SPR program, we believe it would have to be revised to reflect the legal conclusion we have just outlined. However, we do not understand that to be MarAd's position, and therefore cannot provide additional guidance on the issue raised by DOE.

151

Alaskan oil, and have concluded that the plain language of the Cargo Preference Act allows such shipments to be included in DOE's calculation of its Cargo Preference Act compliance for the SPR program. We understand that our analysis of this issue will resolve much of the actual dispute between DOT and DOE with respect to DOE's Cargo Preference Act compliance obligations. With respect to the two questions raised independently by DOE, however, we cannot fully resolve the disagreement between DOT and DOE, because of the continuing controversy between those agencies as to the intent and effect of their interagency agreement.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*